**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| LIFE UNIVERSITY, INC., | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 13 CV 01741-SCJ |
| BRAIN SYNERGY INSTITUTE, LLC, | ) |
| KBCR, LLC and CARRICK BRAIN | ) |
| CENTERS, | ) |
| | ) |
|      Defendants. | ) |

**PLAINTIFFS' AMENDED MEMORANDUM IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS...... ..................................................................... i, ii

TABLE OF AUTHORITIES ............................................................... iii, iv, v

I.      INTRODUCTION .............................................................................1

II.     ARGUMENT AND CITATION OF AUTHORITIES...........................................2

     A.  The Georgia Long-Arm Statute Is Satisfied .....................................5

     B.  Personal Jurisdiction is Proper Under Federal Jurisprudence...........................7

          1.  Defendants are Subject to General Jurisdiction in Georgia .................7

             a.  BSI's communications with CrossFields, ICON, Ackerman, and Corporate Plaza – all companies operating in Georgia .....................................8

             b.  BSI conducted multiple in-person meetings in Georgia before May 23 .........................................13

             c.  BSI contacts with Georgia also include soliciting Life doctors (Dr. Carrick, Dr. Antonucci, Dr. Shores, and Dr. Duffy)......................................15

          2.  Defendants are subject to Specific Jurisdiction in Georgia ................19

             a.  The present cause of action arises out of or relates to BSI's specific contacts with Georgia...................19

             b.  Defendants purposefully availed themselves of the privilege of conducting activities in Georgia...........................19

             c.  BSI should have reasonably anticipated being haled into court in Georgia .............................................21

             d.  Exercise of jurisdiction over Defendants will not offend "traditional notions of fair play and substantial justice ...............................................................21

             e.  BSI's Analysis is Incorrect .....................................23

III.    CONCLUSION..................................................................................24

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*3Q Technologies, Ltd. v. Canfield Scientific, Inc.*,
    2006 U.S. Dist. LEXIS 36490, *10-*11 (N.D. Ga. 2006)........................ 4

*Akro Corp. v. Luker*,
    45 F.3d 1541, 1548-49 (Fed. Cir. 1995) ............................................ 21, 25

*Atlantis Hydrophonics, Inc. v. Int'l Growers Supply, Inc.*,
    2013 U.S. Dist. LEXIS 2187, *28 (N.D. Ga. Jan. 3, 2013).................... 23

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
    566 F.3d 1012, 1017 (Fed. Cir. 2009) .................................................. 4, 23

*Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*,
    552 F.3d 1324, 1333 (Fed. Cir. 2008) ..................................................... 23

*Breckenridge Pharmaceutical, Inc. v. Metabolite Labs., Inc.*,
    444 F.3d 1356, 1363 (Fed. Cir. 2006) ..................................................... 25

*Burger King v. Rudzewicz*,
    471 U.S. 462, 475, (1985)......................................................................... 5

*Campbell Pet Co. v. Miale*,
    542 F.3d 879, 885-87 (Fed. Cir. 2008) ................................................... 24

*Canty v. Fry's Elecs., Inc.*,
    736 F. Supp. 2d 1352, 1358 (N.D. Ga. 2010)........................................... 5

*Classic Weavers, Ltd. v. Couristan, Inc.*,
    1996 U.S. Dist. LEXIS 20020 (N.D. Ga. 1996) ..................................... 21

*Consol. Dev. Corp. v. Sherritt, Inc.*,
    216 F.3d 1286, 1291 (11th Cir. 2000) ....................................................... 4

*Diamond Crystal Brands, Inc. v. Food Movers Int'l., Inc.*,
    593 F.3d 1249, 1258, 1260 (11th Cir. 2010) ............................ 2, 3, 4, 5, 6

*Evans v. Hewlett-Packard Co.*,
    2013 U.S. Dist. LEXIS 80700, 2-3 (S.D. Fla. May 30, 2013)................ 12

*Helicopteros Nacionales de Colombia v. Hall*,
    466 U.S. 408 (1984)............................................................... 4, 8

*Inamed Corp. v. Kuzmak*,
    249 F.3d 1356, 1361-62 (Fed. Cir. 2001) ................................. 25

*Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*,
    279 Ga. 672 (2005) ................................................................ 3

*Murphy v. Aventis Pasteur, Inc.*,
    270 F. Supp. 2d 1368, 1378 (N.D. Ga. 2003)............................ 5

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
    148 F.3d 1355, 1361 (Fed. Cir. 1998) .................................... 24

## I.     INTRODUCTION

On May 23, 2013, Plaintiff Life University, Inc. ("Life") filed suit in this jurisdiction seeking a declaratory judgment of non-infringement and invalidity as to U.S. Patent No. 6,800,062 ("the '062 patent") against Defendants Brain Synergy Institute, LLC; KBCR, LLC; and Carrick Brain Centers (hereafter collectively referred to as Defendants or "BSI").  BSI moved to dismiss, alleging this Court lacks personal jurisdiction.  On August 23, 2013, the Court granted Life a limited period of time to conduct jurisdictional discovery.  The evidence from this discovery shows that BSI has had substantial and continuous contact as shown through numerous activities in this forum both related and unrelated to the causes of action at issue here.

These actions by BSI illustrate conclusively that the Georgia long-arm is satisfied, and that a finding of both general and specific jurisdiction are proper. Apart from the circumstances leading to the present suit, BSI has since, at least as of March of 2013, repeatedly and continuously sought out services, negotiated agreements, and solicited doctors in Georgia in pursuit of opening a treatment facility in this forum, a facility that opened on July 29, 2013.  Through its motion, BSI is silent on these actions, instead focusing almost exclusively on its travel to Atlanta in May of 2013 when it delivered its demand letter in person to Life

1

personnel.  Yet doing so wholly ignores the extensive, intimate "contacts" BSI had with Georgia that makes jurisdiction proper in this forum.

## II.  ARGUMENT AND CITATION OF AUTHORITIES

The Court applies a two-part test to determine whether it has personal jurisdiction over an allegedly nonresident defendant.  First, the Court determines whether the Georgia long-arm statute permits the exercise of jurisdiction.  Second, the Court determines whether the defendant has sufficient "minimum contacts" to satisfy due process so that maintenance of the suit does not offend "traditional notions of fair play and substantial justice."  *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1258 (11th Cir. 2010).

"[T]he exercise of personal jurisdiction in Georgia requires a court to find that at least one prong of the long-arm statute is satisfied."  *Diamond Crystal Brands*, 593 F.3d at 1260.  The relevant portion of Georgia's long-arm statute provides the following:

> A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
> (1) Transacts any business within this state;

2

O.C.G.A. § 9-10-91 (2012).

Although BSI is correct that the Georgia Supreme Court has recently interpreted Georgia's long-arm statute as not being "coextensive" with "procedural due process," BSI is incorrect when it asserts that Georgia's interpretation is narrower than federal due process. Indeed, application of the Georgia long-arm statute is a literal one, whereby "O.C.G.A. 9-10-91(1) grants Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in this State." *Diamond Crystal Brands*, 593 F.3d at 1261 (*quoting Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa*, 620 S.E.2d 352 (2005)).

Accordingly, Georgia's long-arm statute is in fact ***broader*** than that allowed under federal jurisprudence. *See Diamond Crystal Brands*, 593 F.3d at 1260-61 ("[T]he supreme court immediately recognized that even this literal construction of subsection (1) would 'expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process.'"). And while it is impermissible to extend personal jurisdiction beyond the limits of procedural due process, the Eleventh Circuit has explained that the determination of the literal reach of the Georgia long-arm statute should be considered apart from any considerations of due process. *See id.* at 1261 ("[L]iterally transacting business within Georgia

3

remains a precondition to long-arm jurisdiction that is independent from the
dictates of due process.").

If a defendant is subject to a Georgia's long-arm statute, a court must then
ascertain if the exercise of personal jurisdiction would violate the Due Process
Clause. *See Diamond Crystal Brands*, 593 F.3d at 1261; *see also Autogenomics,
Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009). To assess
federal due process, the Court must consider whether jurisdiction over a person is
"general" or "specific." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S.
408 (1984). "General personal jurisdiction arises from a party's contacts with the
forum state that are unrelated to the litigation; the test for general jurisdiction is
whether the party had 'continuous and systematic' general business contacts with
the forum state." *See*, *e.g.*, *3Q Technologies, Ltd. v. Canfield Scientific, Inc.*, 2006
U.S. Dist. LEXIS 36490, *10-*11 (N.D. Ga. 2006), (citation omitted); *see also
Heliopteros*, 466 U.S. at 414-16. Specific jurisdiction is applicable if "the nature
of the defendant's contacts with the state are such that it may be held liable only
for causes of action stemming from a particular activity" and that "[t]he cause of
action must arise directly out of or be directly related to a defendant's contacts with
the forum." *Id.*; *see also Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291
(11th Cir. 2000). In order to fulfill the "minimum contacts" requirement for

4

specific jurisdiction, a plaintiff must demonstrate: (1) that the plaintiff's cause of action "arises out of or relates to" the defendant's contacts with the forum state; (2) that the defendant "purposefully availed" itself of conducting activities within the forum state and invoked the benefits and protection of the forum state's laws; and (3) that the defendant should have reasonably anticipated being haled into court in the forum state. *Diamond Crystal Brands*, 593 F.3d at 1267, *see also Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985).  A single act, however, can be sufficient to confer specific jurisdiction over a defendant. *See*, *e.g.*, *Murphy v. Aventis Pasteur, Inc*., 270 F. Supp. 2d 1368, 1378 (N.D. Ga. 2003).

BSI's activities show extensive and continuous contacts in this forum, making it subject to Georgia's long-arm statute and proper for this Court to exercise general and specific jurisdiction in conformance with federal due process.

## A.   The Georgia Long-Arm Statute Is Satisfied

Under subsection 1 of the Georgia long-arm statute, this Court may exercise personal jurisdiction over any alleged nonresident who "[t]ransacts any business in this state." O.C.G.A. § 9-10-91(1).  "Interpreted literally, 'transacts any business' requires that the 'nonresident defendant has purposefully done some act or consummated some transaction in [Georgia]. . . .'" *Canty v. Fry's Elecs., Inc*., 736 F. Supp. 2d 1352, 1358 (N.D. Ga. 2010) (*citing Diamond Crystal Brands*, 593 F.3d

at 1264).  "Transact means to prosecute negotiation*s*, to carry on business, to carry

out, or to carry on."  *Diamond Crystal Brands*, 593 F.3d at 1264 n.18 (internal

quotation omitted).[1]

    Here, BSI transacted business in Georgia (specifically related to its

enforcement actions leading to the filing of Life's suit) through at least the

following: (i) contracting to utilize airspace in Georgia to serve the demand letter

(Exhibit A, Budagher Dep. at 139: 8-16); (ii) contracting to utilize a rental car to

serve the demand letter (*id*. at 139:17-23); (iii) contracting to book a hotel to serve

the demand letter (*id*. at 141: 2-6); and (iv) negotiating terms of a license

agreement with Life after delivering the demand letter (*id*. at 62:l to 64:l).

    While any of the above activities would satisfy Georgia's long-arm statute, it

is indisputable that the offer by BSI to settle its claims of patent infringement for

$1,000 per patient treatment (based on knowledge of the revenue derived from the

use of the GyroStim device (*see* Exhibit A at 62:1 to 64:l)) satisfies the "transacts

any business" prong of the statute.  Indeed, the Eleventh Circuit in *Diamond*

---

[1] BSI alleges that the business must be related to the cause of action pled in Life's
Complaint.  Life disagrees, as the Eleventh Circuit has noted that the statute is
broadly construed to cover "any business."  *See Diamond Crystal Brands*, 593 F.3d
at 1264.  Nonetheless, as shown herein, BSI's activities related to its enforcement
measures in Georgia – which form the basis of Life's declaratory judgment action
– are sufficient to show that BSI transacted business within Georgia related to the
cause of action without need to consider the numerous other business activities
outlined herein.

*Crystal* explicitly found that "to prosecute negotiations" fell within the meaning of the "transacts any business" language. *Diamond Crystal Brands*, 593 F.3d at 1264 n.18. Accordingly, BSI's claim that the long-arm statute – which is construed broadly in Georgia – is not satisfied is without merit. It is most definitely satisfied. And in view of this, Life submits that BSI has literally met the requirements of the Georgia long-arm statute.

### B.   <u>Personal Jurisdiction is Proper Under Federal Jurisprudence</u>

The next inquiry is whether exercise of personal jurisdiction comports with principles of due process. For the reasons set forth below, Life submits that BSI is subject to both general and specific jurisdiction in this State.

### 1.   **Defendants are Subject to General Jurisdiction in Georgia**

This Court may exercise general jurisdiction over Defendants based on the extensive, systematic, and continuous contacts that BSI had with Georgia companies and individuals prior to the filing of Life's Complaint on May 23, 2013. Specifically, from March 11, 2013 until the filing of Life's Complaint, BSI made numerous visits; negotiated numerous contracts with service providers, the landlord of the office space, and prospective employees located in Georgia; and maintained almost daily contact with individuals located in the State. Together, these activities can be described as nothing other than "continuous and

7

systematic," as required to confer general jurisdiction. *Helicopteros*, 466 U.S. at 414-16.

The attached Exhibit B provides a comprehensive timeline detailing BSI's numerous contacts prior to the filing of Life's complaint relating to the design and construction of BSI's Georgia facility, which opened on July 29, 2013. For the convenience of the Court, Life below highlights a selection of these contacts and others that confer general jurisdiction over BSI.

> **a.    BSI's communications with CrossFields, ICON, Ackerman, and Corporate Plaza – all companies operating in Georgia**

Between March 11, 2013 and the filing of the Life Complaint on May 23, 2013, BSI had the following continuous and extensive business contacts within this forum:  communications with various employees of CrossFields, Inc. for architectural and design services; communications with various employees of commercial broker ICON Commercial Interests, LLC; communications with the agent (Akerman) and landlord (Corporate Plaza) of the prospective office space in Georgia; and communications with Georgia state officials for the purpose of obtaining permits to open its facility at 1950 Spectrum Circle, Marietta. In total, Exhibit B shows that BSI had at least 123 separate and substantive contacts during this time frame. These include the following:

8

- **March 11, 2013** – Dr. Carrick, in partnership with BSI, paid to CrossFields $1,000 for completion of the space plan of the Marietta, Georgia office space (Exhibit C, Declaration of Scott Boldt, President of CrossFields Inc., at Exhibit A, p. 2, para. 3; *id*. at Exhibit A p. 2, para. 2; *id*. at Exhibit 6c).

- **March 18/19, 2013** – BSI employee Ethan Joubrean contacted via phone and email CrossFields regarding architectural and design services for the Marietta, Georgia office space base on information provided by Dr. Carrick (Exhibit C at Exhibit A, p. 2, para. 3).

- **March 21, 2013** – BSI approved the conceptual designs for the 1950 Spectrum Circle, Marietta, Georgia office space (Dkt. No. 8-5).

- **March 25, 2013** – BSI conducted a video/web conference with CrossFields and Trish Carrick Merlin reviewing approved plans (Exhibit C at Exhibit A, p. 2, para. 4).

- **March 29, 2013, April 1, 2013, April 10, 2013, April 12, 2013, April 17, 2013, April 25, 2013, May 9, 2013, May 16, 2013** – BSI corresponded with ICON regarding the terms of its lease agreement/letter of intent with Ackerman, the agent for the Georgia office space (BSI011, BSI012, BSI015, BSI016, BSI027, BSI029, BSI030, BSI031, BSI039, BSI053, BSI054, BSI186, BSI187, BSI243).[2]

- **April 4, 2013** – CrossFields invoiced BSI for Schematic Design services provided between March 21,2013 and April 8, 2013, in the amount of $2,500 (Exhibit C at Exhibit 7; BSI336).

- **April 4, 2013** – CrossFields sent an invoice to BSI for a $25,000 retainer (BSI336).

- **April 10, 2013** – BSI executed its agreement with CrossFields for services estimated to be approximately $82,000 (Dkt. No. 8-5; BSI026).

---

[2] BSI's production cited herein (*e.g.*, BSIXXX) are found within Exhibit D.

- **April 15, 2013** – CrossFields confirmed commencement of the full scope of services for BSI (BSI033-34).

- **April 17, 2013** – BSI submitted payment to CrossFields in the amount of $2,500 pursuant to the construction and design agreement (BSI040; Exhibit E, Defendant's Objections and Responses to Plaintiff's Jurisdictional Discovery Requests and Interrogatories, at p. 6, para. 1).

- **April 22, 2013** – Teleconference between BSI and Ackerman (BSI042, BSI043, BSI044).

- **April 23, 2014** – BSI submitted payment to CrossFields in the amount of $25,000 (BSI045; BSI046; BSI047; Exhibit E at p. 6, para. 1).

- **April 29, 2013** – BSI exchanged correspondence with CrossFields about scope of project, including detailed project schedule for Marietta, Georgia office space (BSI057, BSI058, BSI0559, BSI405-07).

- **May 5, 2013** – CrossFields invoiced BSI $30,448.75 for work performed between April 10 to April 26, 2013 (BSI318-320).

- **May 9, 2013** – On BSI's behalf, CrossFields met with Cobb County Fire Marshal to submit preconstruction plans for code review (Exhibit C at Exhibit A, p. 3, para. 2; *id*. at Exhibit 10).

- **May 21, 2013** – CrossFields completed architectural, electrical and plumbing construction documents, finishing expected services in contract valued at more than $62,000 (*see* Exhibit C at Exhibit A, p. 3, para. 2; BSI000244; BSI000253; *see also* Dkt. No. 8-5).

- **May 23, 2013** – On BSI's behalf, CrossFields met with Cobb County Fire Marshal regarding plan review and acceptance by the county of plans for office space (Exhibit C at Exhibit 10).

As can be seen, BSI's relationship with CrossFields was extensive, and the continuous contacts before and after executing the agreement (*see* Dkt. No. 8-5)

are sufficient alone to show the "continuous and systematic" contacts required for general jurisdiction.  Further, many of the services rendered by CrossFields required that CrossFields act on BSI's behalf by performing specific tasks within Georgia relating to the development of BSI's facility, including communicating and meeting with subcontractors and government officials located in Georgia.  All told, the services completed by CrossFields prior to the filing of Life's complaint exceeded ***880 hours of service time and resulted in fees greater than $62,000*** (*see id.*; *see also* BSI318-320; Exhibit C at Exhibit 9).[3]  In addition to these services, BSI spent an additional $13,000 to demolish the existing office space in preparation for construction of the BSI facility before May 17, 2013 (*see* BSI000244 ("[D]emo of the initial space (approx 12000sf) has been complete."); *see also* Exhibit A at 66:14 to 67:3).

    In addition to these contacts, BSI also held itself out as a Georgia ***resident***. Specifically, the CrossFields agreement notes that it was "being entered into ***by residents of Georgia***" [CrossFields and BSI] and that it was "being executed in Georgia and the laws of the State of Georgia shall in all respects control the

---

[3] Defendants agreed to pay $62,000 to CrossFields to "perform Architectural, Interior Design, Furniture & Engineering Services" for the new clinic at the Marietta location (*see* Dkt. No. 8-5), and as of the filing of Life's Complaint, BSI had already paid CrossFields $28,500.00 (Exhibit E at p. 6, para. 1) and had an outstanding balance of $30,448.75 for services already provided (BSI318-320).

construction and interpretation of this Agreement" (Dkt. No. 8-5 (emphasis added)). Thus, by BSI's own admission, BSI considered itself a ***resident of Georgia***, automatically making it subject to personal jurisdiction. *See*, *e.g.*, *Evans v. Hewlett-Packard Co*., 2013 U.S. Dist. LEXIS 80700, 2-3 (S.D. Fla. May 30, 2013).

Further, during the same period that BSI communicated with CrossFields, BSI also continuously communicated with the broker/agent (Akerman) and landlord (Corporate Plaza) relating to construction tasks, the letter of intent regarding the office space, and the lease agreement for the property at 1950 Spectrum Circle. For example, as of March 25, 2013, the date of the first correspondence between Defendants and ICON (*see* BSI009, email dated March 25, 2013 from J. Saunders of ICON to E. Joubran including draft lease for Marietta, Georgia office space), Defendants engaged ICON Commercial Interests and began negotiating the lease agreement with Corporate Plaza. And a review of BSI's documents indicates that from March 25, 2013, BSI was also in continuous communication with ICON regarding negotiation of the terms of the Corporate Plaza lease/letter of intent (*see* BSI009; BSI010; BSI011; BSI012; BSI015; BSI016; BSI027; BSI028; BSI029; BSI030; BSI031; BSI039; BSI053; BSI054; BSI186; BI187; BSI243).

The above activities illustrate that BSI – contrary to its assertions – has not only had "continuous and systematic" contacts with Georgia companies, but also considers itself to be a resident of this forum, all of which confirms that general jurisdiction is proper in this forum.

### b.   BSI conducted multiple in-person meetings in Georgia before May 23

In addition to the communications described above, BSI also purposefully travelled to Georgia several times prior to the filing of Life's Complaint to visit with various parties concerning the opening of its new facilities.  Such in-person meetings provide additional contacts in this forum, and show that BSI has more than "purposefully availed" itself in this jurisdiction.

Indeed, between June 2012 and the filing date of the Life Complaint on May 23, 2013, BSI traveled to Georgia at least four times and conducted at least eight separate in-person business meetings relating to the opening of its Atlanta office, in addition to the several video/web conferences between BSI and CrossFields.  These in-person visits are as follows:

- **June 2012** – BSI founder Ken Beam travelled to Atlanta to discuss business relations with Kevin Maher, the inventor of the GyroStim chair (Dkt. No. 7-2, ¶ 7; Exhibit A at 70:3-15).  It was during this trip that BSI was introduced to Dr. Ted Carrick, who was at that time an employee of Life (Dkt. No. 7-2, ¶ 7).

- **March 20, 2013** – BSI (Ethan Joubrean) conducted an in-person meeting with CrossFields, Dr. Carrick, and Dr. Carrick's daughter, Tricia Carrick Merlin, at the 1950 Spectrum Circle office space in Marietta, Georgia to evaluate the space, review the design and construction schedule, and review the conceptual budget (Exhibit C at Exhibit A, p. 2, para. 3; BSI001; Exhibit A at 88:13 to 91:20).

- **April 8, 2013** – In furtherance of opening BSI Georgia facility, CrossFields met with Dr. Ted Carrick and Trish Carrick Merlin, after Dr. Carrick had signed his employment contract with BSI, to discuss design details, finishes, and furniture decisions (Exhibit C at Exhibit A, p. 2, para. 6).  While BSI asserts that Dr. Carrick was not BSI's employee at this time, his (and Ms. Merlin's) actions were at BSI's request and for the benefit of BSI, therefore establishing additional contacts within this forum.

- **April 25, 2013** – BSI (Michael Budagher and Ethan Joubran) conducted an in-person meeting with CrossFields, Dr. Carrick, Trish Carrick Merlin, and other doctors in Marietta, Georgia reviewing design development documents and approving the scope of the project (Exhibit C at Exhibit A, p. 2, para. 8; Exhibit H, Carrick Dep. at 81:12 to 83:24).  At this meeting the Design Development Documents prepared by CrossFields were reviewed in person by BSI (*see* Exhibit C at Exhibit A, p. 2, para. 8).

- **May 7, 2013** – BSI (Ethan Joubran) conducted an in-person meeting with Dr. Derek Barton (Life University Clinician) in Georgia regarding their "new venture" (BSI184; Exhibit A at 79:1-16).

- **May 7, 2013** – BSI (Michael Budagher and Ethan Joubran) conducted an in-person meeting with Ackerman in Georgia to negotiate the terms of the lease and build-out of its new clinic in Georgia (BSI182, BSI183 BSI186, Exhibit A at 136:16 to 141:1).

- **May 8, 2013** – BSI (Ethan Joubran) conducted an in-person meeting with Derek Barton (Life University Clinician) where Dr. Barton provided a "tour of the clinic" (BSI184).

14

- **May 8, 2013** – BSI (Micheal Budagher, Ken Beam and Ethan Joubran) conducted an in-person meeting with Life doctors (Dr. Ted Carrick, Dr. Matt Antonucci, Dr. Jacob Shores, and Dr. Derek Barton to discuss their employment with BSI in Dallas and Georgia (BSI184; Exhibit A at 79:9-16; *id.* at 141:2 to 142:19).  The purpose of this meeting was at least in part to negotiate the terms of the employment of Dr. Antonucci and Dr. Shores with BSI (*see* BSI181; *see also* Exhibit A at 199:4-19).

- **May 8, 2013** – BSI (Michael Budagher, Ken Beam and Ethan Joubran) conducted in in-person meeting with CrossFields and Ackerman at the 1950 Spectrum Circle office space in Marietta, Georgia, discussing terms of lease and CrossFields role in the construction (Exhibit C at Exhibit A, p. 3, para. 1).

As noted, BSI also conducted at least two video/web conferences with CrossFields on March 25 and April 10 (s*ee* Exhibit C at Exhibit A, p. 2, para. 4; *id.* at Exhibit A, p. 2, para. 7).  Accordingly, the above interactions – all of which occurred in Georgia – offer further proof that BSI had continuous and systematic contacts with Georgia prior to Life filing its Complaint.

   c.   **BSI's contacts with Georgia also include soliciting Life doctors (Dr. Carrick, Dr. Antonucci, Dr. Shores, and Dr. Duffy)**

While the above is more than sufficient to confer general jurisdiction, BSI's contacts also extend to the solicitation and negotiation of contracts with individuals located in Georgia.  Dr. Carrick was the head of the Functional Neurology Center (FNC) at the Life campus in Marietta, Georgia (Exhibit F, Declaration of Stephen

15

Bolles at ¶3).  Dr. Carrick met with BSI on March 4, 2013, where Life's use (and possible patent infringement) of the GyroStim chair at Life was discussed, as well as the possibility of partnering with Dr. Carrick in future clinics and Dr. Carrick working for BSI (*see* Exhibit H at 21:22 to 24:5).  On March 11, 2013, Dr. Carrick submitted his resignation to the University (effective May 21, 2013) stating that the basis for resigning was because he was opening a 20,000 square-foot, six-million dollar clinic in Atlanta close to the University campus (Exhibit F at ¶5, 13).  On that same date, Trish Carrick Merlin informed CrossFields that BSI would be partnering with Dr. Carrick in the Atlanta treatment facility planed for the Marietta, Georgia office space (*see* Exhibit C at Exhibit A, p. 2, para. 3).  On March 28, 2013, Dr. Carrick signed an employment agreement with BSI with the term to begin June 11, 2013 (*see* BSI258-72).  Thus, between March 11 and March 28, Dr. Carrick had substantive negotiations with BSI relating to his employment agreement (Exhibit A at 71:23 to 73:10).

Further, during the week of April 29, 2013 to May 4, 2013, Dr. Carrick completed rounds at the University accompanied by his daughter, Tricia Carrick Merlin (Exhibit F at ¶7).  During these rounds Dr. Carrick informed other doctors and patients that was he was opening a new center in Georgia as early as August 2013 (Exhibit F at ¶7; *see also* Exhibit H at 135:21 to 137:16; *id*. at 142:2-

16

22; *id*. at 143:25 to 144:6 (admitting that he told doctors and provided information to patients)).[4]  By this time, Dr. Carrick was acting on BSI's behalf.[5]  For example, at the May 8, 2013 meeting between Life and BSI, Defendants held themselves out as "investors" in Dr. Carrick's new chain of clinics, showing that BSI considered Dr. Carrick a partner (*see* Exhibit F at ¶7).

Additionally, on May 18, 2013, before the filing date of the University's Complaint, Dr. Matt Antonucci (an employee of Life University) resigned from the University (Exhibit F at ¶13).  BSI's records indicate that at least as of April 24, 2013, it had begun negotiations with Dr. Matt Antonucci regarding the terms of his employment with BSI to ultimately work at the Atlanta facility (*see* BSI049; *see also* BSI061-81; BSI125; BSI126-46; BSI181; BSI194-214; Exhibit A at 80:7 to 80:15; *id*. at 77:18 to 78:8).  Indeed, by the middle of May, Dr. Antonucci was

---

[4] Dr. Carrick was relieved of his duties at the University effective May 21, 2013, before the filing date of the University's Complaint (Exhibit F at ¶13).  Dr. Carrick ceased all activities at the University at least by May 13, 2013 (*id.*).

[5] BSI has refused to produce Dr. Carrick's communications between and relating to BSI (*see* Exhibit G, Correspondence between Plaintiff's counsel and Defendant's Counsel).  Given the short time period set for discovery and overwhelming weight of evidence supporting jurisdiction, Life has chosen not to burden the Court with this discovery dispute.  However, Life submits that it is highly likely that the communications withheld would show the true extent of Dr. Carrick's actions on BSI's behalf, including additional substantive actions with regard to the development of the BSI Georgia facility and solicitation of other Life doctors by Dr. Carrick on BSI's behalf.

travelling from Atlanta to Texas at BSI's request to perform employment duties in Dallas (Exhibit A at 35:22 to 37:9).[6]

Similarly, in January 2013, BSI interviewed Dr. Jacob Shores (an employee of Life University) (Exhibit A at 83:24 to 84:2). This interview ultimately resulted in an offer of employment, extensive negotiations, and an executed employment agreement (*see* BSI274-93; Exhibit A at 81:24 to 82:22). Further, in December of 2012 or January of 2013, BSI had begun negotiations with Dr. James Duffy (an employee of Life University) regarding the terms of his employment with BSI (*see* Exhibit A at 83:24 to 84:2; *see also* BSI037-38; BSI051; BSI052; BSI082-102; BSI147-67; BSI178-79; BSI180; BSI183; BSI215-235; BSI249; and BSI251).

In sum, the facts confirm that prior to the filing of Life's Complaint, BSI had a multitude of contacts with individuals employed by Life and prospective patients, resulting in additional contacts, all of which further confirms that exercise of general jurisdiction over BSI is proper and fair in Georgia.

### 2.   Defendants are Subject to Specific Jurisdiction in Georgia

Assuming *arguendo* that general jurisdiction has not been demonstrated, the facts here also establish that BSI is subject to specific jurisdiction in Georgia.

---

[6] Notably, Dr. Antonucci was scheduling patients for June while working at Life in the month of April (*see* BSI049). He therefore more than likely was likewise scheduling patients in July while working at BSI in May.

### a. The present cause of action arises out of or relates to BSI's specific contacts with Georgia

The acts specifically related to the present action are those surrounding the solicitation of Dr. Carrick in March of 2013,[7] Dr. Carrick's allegations of patent infringement to Dr. Reikeman, the President of Life University (*see* Exhibit H at 113:14 to 114:13; 116:21 to 117:20), Dr. Carrick's March 2013 allegations of patent infringement in discussion with Dr. Epley, inventor of the '062 patent (*see* Exhibit H at 122:12 to 125:18), and the meeting with BSI representatives regarding BSI's demand letter on May 8, 2013.  Facts related to these events are sufficient to confer specific jurisdiction, as outlined below.

### b. Defendants purposefully availed themselves of the privilege of conducting activities in Georgia

On May 8, 2013, Defendants traveled from Texas to Marietta, Georgia to personally hand-deliver a demand letter to Life (*see* Exhibit F at ¶8).  The demand letter alleged the University's use of the GyroStim chair infringed the '062 patent, owned by Defendants (Dkt. No. 1-2).  The letter also stated that Defendants "cannot permit Life University to continue its infringing conduct" and immediately demanded the University cease all use of the GyroStim chair (Dkt. No. 1-2).

---

[7] Dr. Carrick's solicitation is related to the cause of action because Dr. Carrick is responsible for providing information to BSI regarding Life's activities using the GyroStim chair and issues of "patent infringement" related the '062 patent (*see* Exhibit H at 21:22 to 22:8, 8:9 to 20:11, 24:21 to 25:9).

Defendants indicated that "if an informal resolution cannot be reached, BSI intends to move forward and initiate an action for patent infringement in the appropriate United States District Court" (*id*.).  At the meeting, Defendants indicated that the University could continue the use of the GyroStim chair by taking a license from Defendants under the '062 patent (Exhibit F at ¶ 12; Exhibit A at 62:13 to 64:1).  Defendants offered a license at $1,000 per patient based on Life's current treatment rates and BSI's estimation of University profits (Exhibit F at ¶ 12; Exhibit A at 62:13 to 64:1).

BSI thus availed itself of the rights and laws of the State of Georgia in delivering the demand letter.  It is undisputed that BSI utilized Georgia roadways (Exhibit A at 139:17-23) and airspace (*id*. at 139:8-16) and stayed in local hotels (*id*. at 141:2-6) to conduct activities leading to this suit.  *See Burnham v. Superior Court*, 495 U.S. 604, (1990) (physical presence in a forum state can be a basis for personal jurisdiction).  Moreover, at the May 8 meeting, BSI took affirmative actions to threaten suit against Life and then sought to negotiate a license with Life for use of the patent (Exhibit A at 62:13 to 64:1).  These actions alone show that BSI purposefully availed itself of the privilege of conducting substantial activity in Georgia, which is sufficient to confer specific jurisdiction.  *See*, *e.g.*, *Akro Corp. v. Luker*, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) (holding that exclusive licensing of

20

the accused infringer's competitor in the forum state constituted the required

"additional activity" beyond sending warning letters).

### c. BSI should have reasonably anticipated being haled into court in Georgia

Given the actions taken by BSI, BSI should have anticipated facing a suit in

this jurisdiction.  To find otherwise would defy logic, given the extent of the

measures taken by BSI in the forum and the threats provided therein.

### d. Exercise of jurisdiction over Defendants will not offend "traditional notions of fair play and substantial justice"

To determine whether the exercise of personal jurisdiction comports with

"notions of fair play and substantial justice," courts assess (1) the burden on the

defendant; (2) the forum's interest in the litigation; and (3) plaintiff's interest in

obtaining convenient and effective relief.  *See*, *e.g.*, *Classic Weavers, Ltd. v.

Couristan, Inc*., 1996 U.S. Dist. LEXIS 20020 (N.D. Ga. 1996) (citations omitted).

Here, these factors favor a finding of specific jurisdiction.

First, BSI would not be burdened to defend in this jurisdiction.  BSI has

initiated patent litigation in Colorado, after the filing of the present action, against

the manufacturer of the GyroStim chair.  That action will not resolve issues of

patent infringement concerning Life's *use* of the GyroStim chair.  Colorado is no

more convenient to BSI (a Texas corporation) than Georgia.   In addition, the

Colorado defendants (Ultrathera and Maher) have moved to intervene in this present litigation (*see* Dkt. No. 7), meaning that this Court will be able to resolve all issues in one case, thus creating ***less burden*** for BSI.[8]

Second, just as Georgia has an interest in discouraging injuries, including injuries to its corporate citizens as a result of violations of patent rights, it also has an interest in protecting its citizens from unsubstantiated claims of patent infringement.  This suit deals with the latter.

Third, Life has a strong interest in quickly and efficiently litigating this case. As long as the claims remain unresolved against Life, a question will remain concerning Life's use of the GyroStim device.  Therefore, Life is with substantial interest in resolving these issues now and confirming that it is not infringing any valid patents associated with BSI.

### e.  BSI's Analysis is Incorrect

Instead of going through the above-listed factors – which, as shown, all support a finding of specific jurisdiction – BSI concentrates only on the delivery of the demand letter to Life and asserts that this act alone cannot confer specific jurisdiction (*see* Dkt. No. 8-1, p. 13).  Yet the cases cited in support of BSI's position are distinguishable.  In *Atlantis Hydroponics, Inc. v. Int'l Growers Supply,*

---

[8] Ultrathera and Maher have also sought to transfer the Colorado action to Georgia where it would be appropriate to consolidate it with this action (*see* Exhibit I).

*Inc.*, this Court found that specific jurisdiction was not available where a plaintiff had taken "no enforcement action in the forum aside from a licensing demand letter." No. 1:12-CV-1206, 2013 U.S. Dist. LEXIS 2187, *28 (N.D. Ga. Jan. 3, 2013). Similarly, the Federal Circuit in *Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*, noted that "letters threatening patent suit ***by themselves*** 'do not suffice to create personal jurisdiction.'" 552 F.3d 1324, 1333 (Fed. Cir. 2008) (citation omitted) (emphasis added). Likewise, the reason the meetings in *Autogenomics, Inc. v. Oxford Gene Tech., Ltd.*, were not sufficient to confer specific jurisdiction was because the meetings were "irrelevant to the [] suit" (thus not meeting the first factor for specific jurisdiction). No. SACV-07-846, 2008 U.S. Dist. LEXIS 111756, at *22-23 (C.D. Cal. Jan. 17, 2008). In other non-precedential cases cited by BSI, while meetings were held to resolve claims of patent infringement, the actions taken by the defendants in those meetings appear to be limited.

In contrast, in this case, not only were there multiple meetings in Georgia concerning BSI's claims, but there were also overt threats to sue Life if Life did not capitulate to BSI's demands. Moreover, BSI provided details of a specific negotiation point for a license arrangement, and the other activities by BSI in March of 2013 resulting in BSI's relationship with Dr. Carrick extend beyond acts of simply delivering a licensing letter. For example, Dr. Carrick has admitted that

after he executed his employment contract with BSI on March 28, 2013, he asserted to Dr. Guy Reikeman, the President of Life University, that Life was infringing the '062 patent through its use of the GyroStim chair (*see* Exhibit H at 113:14 to 114:13; 116:21 to 117:20).  Further, Dr. Carrick provided information to BSI about Life's use of the GyroStim chair that undoubtedly precipitated BSI's decision to accuse Life of infringement (*see* Exhibit H at 21:22 to 24:5).

Moreover, while "cease-and-desist letters alone do not suffice to justify personal jurisdiction" in a declaratory judgment action (*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc*., 148 F.3d 1355, 1361 (Fed. Cir. 1998)), other enforcement actions taken in conjunction with the issuance of demand letters have been found to be sufficient to support specific jurisdiction over a patentee in a foreign forum.  *See e.g*., *Campbell Pet Co. v. Miale*, 542 F.3d 879, 885-87 (Fed. Cir. 2008) (holding that "extra-judicial patent enforcement" harming plaintiff's business activities in forum state justified exercise of personal jurisdiction).  These activities notably include licensing efforts.  *See*, *e.g.*, *Breckenridge Pharm.*, 444 F.3d at 1366-67 (holding that a license with an entity in the forum state is sufficient extra activity to establish jurisdiction); *Akro Corp. v. Luker*, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) (holding that licensing efforts in the forum state were sufficient "additional activity" beyond sending warning letters); *Inamed*

24

*Corp. v. Kuzmak*, 249 F.3d 1356, 1361-62 (Fed. Cir. 2001) (holding that "the combination of …. [an] infringement letter and [] negotiation efforts which culminated in licensing agreements" justified a finding that the party had "purposefully directed his activities at residents of [the forum]").

Accordingly, BSI's "extra-judicial patent enforcement" actions in this forum, including the information learned through Life employees and attempt to license the patent to Life, distinguish this case from the cases cited by BSI where jurisdiction has been denied on the basis of the delivery of a demand letter alone. Because "notions of fair play and substantial justice" are present here, a finding of specific jurisdiction is proper.

## III.   CONCLUSION

For the foregoing reasons, Life respectfully requests that Defendants' motion to dismiss be denied.

Respectfully submitted, this 20th day of September, 2013.

/s/ David S. Moreland
Anthony B. Askew
Georgia State Bar No. 025300
David S. Moreland
Georgia State Bar No. 521998
Jessica A. Keesee
Georgia State Bar No. 940481
MEUNIER CARLIN & CURFMAN, LLC
817 W. Peachtree Street NW, Suite 500
Atlanta, GA 30308

Telephone: (404) 645-7700
Facsimile:  (404) 645-7707

Frank B. Strickland
Georgia State Bar No. 687600
Bryan P. Tyson
Georgia State Bar No. 515411
STRICKLAND BROCKINGTON LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street NE
Atlanta, GA 30309
Telephone: (678) 347-2200
Facsimile:  (678) 347-2210

**<u>Co-Counsel for Life University</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| LIFE UNIVERSITY, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 13 CV 01741-SCJ |
| BRAIN SYNERGY INSTITUTE, LLC; | ) |
| KBCR, LLC; and CARRICK BRAIN | ) |
| CENTERS, | ) |
| | ) |
|     Defendants. | ) |

**<u>LOCAL RULE 7.1D CERTIFICATION</u>**

The undersigned hereby certifies that the foregoing Plaintiffs' Memorandum

In Opposition of Defendants' Motion to Dismiss was prepared in Times New

Roman 14 point, which is one of the font and point selections approved by the

Court under Local Rule 5.1B.

Dated this 20th day of September, 2013.

<u>/s/ David S. Moreland</u>
David S. Moreland
Georgia State Bar No. 521998

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| LIFE UNIVERSITY, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 13 CV 01741-SCJ |
| BRAIN SYNERGY INSTITUTE, LLC, | ) |
| KBCR, LLC and CARRICK BRAIN | ) |
| CENTERS, | ) |
| | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2013, I electronically filed the

foregoing Plaintiffs' Memorandum In Opposition to Defendants' Motion to

Dismiss with the Clerk of Court using the CM/ECF system, which will

automatically send e-mail notifications of such filing to all attorneys of record.

Dated: September 20, 2013          /s/ David S. Moreland
                                   Georgia State Bar No. 521998
                                   MEUNIER CARLIN & CURFMAN, LLC
                                   817 W. Peachtree Street, N.W., Suite 500
                                   Atlanta, Georgia 30308
                                   Phone: (404) 645-7700
                                   Fax: (404) 645-7707
                                   E-mail: dmoreland@mcciplaw.com

2